UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STANLEY W. GRISSOM,

                Plaintiff,                           FILE NO. 1:05-CV-762

v.                                       HON. ROBERT HOLMES BELL

SAPPI FINE PAPER NORTH AMERICA,
named as Sappi Fine Paper,

                Defendant.
_____/


**<u>OPINION</u>**

      This is an action seeking review of an administrator's denial of benefits under disability retirement plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.*  The matter presently is before the Court on the parties' cross-motions (Docket ## 25, 28) for judgment on the administrative record, in accordance with *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998).  For the reasons that follow, the Court will grant Defendant's motion and deny Plaintiff's motion.

**I.**

      Plaintiff Stanley W. Grissom was an hourly union employee with Defendant Sappi Fine Paper ("Sappi" or "Company") from 1974 until mid-September 2002, when he applied for disability retirement benefits.  (AR 13-14.)  The retirement benefit plan governing Plaintiff's claim is the "S.D. Warren Company Central Mills Employees' Retirement Plan ("Plan"), which provides disability retirement benefits to eligible employees as described in Section 5.3 of the Plan:

     5.3    **Disability Retirement Date**.  If a Member who has completed at least 15 years of Continuous Service suffers a Total and Permanent Disability while an Employee of the Employer or a Related Company, he shall be entitled to retire and receive a Disability Retirement Benefit, as described in Section 6.3, unless he elects an Early Retirement Benefit under Section 6.2 . . . .

(Plan ¶ 5.3; AR 129).  Under the Plan, a "Total and Permanent Disability" means:

     a physical or mental disability as a result of which a Member is wholly and continuously unable to engage in any occupation or perform any work for any kind of compensation of financial value, unless such disability (i) was contracted, suffered or incurred while the Member was engaged in, or resulted from the Member's having engaged in, a criminal act, (ii) resulted from a deliberately self-inflicted injury, or (iii) was contracted, suffered or incurred while in the service of the armed forces of any country.  Any such disability must have existed while employed by the Employer and must be certified by a licensed physician approved by the Employer to be such as can reasonably be expected to continue during the remainder of the Member's lifetime.

(Plan ¶2.46; AR 126-27.)

     The Plan is interpreted and administered by a seven-member, employer-appointed Administrative Committee, consisting of the Vice Presidents of Finance, Human Resources and Procurement, the Director of Compensation and Benefits, the General Counsel of the S.D. Warren Company, and others designated by the S.D. Warren Company's Board of Directors.  (Plan ¶¶ 8.2, 8.9(d); AR 149, 151.)  The Plan permits the Administrative Committee to appoint a Plan Administrator, to whom it may delegate authority to perform the functions of the Administrative Committee, subject to review by the Administrative Committee, either on its own authority or as the result of a claim submitted under the benefit appeal period.  (Plan ¶¶ 8.12, 8.9; AR 151-52.)  The Administrative Committee appointed Michael Hennessey as Plan Administrator.  Under the Plan, denials of benefits by the Plan

Administrator may be appealed to the Administrative Committee within 60 days.  (AR 151.)

Appeals decisions by the Administrative Committee are "final and binding."  (AR 150.)

On November 20, 2002, Plaintiff applied for disability retirement benefits under the

Plan.  He also applied for group disability insurance benefits through a third-party provider,

Aetna.  (AR 11-12.)  In both applications, Plaintiff claimed he was "totally and permanently

disabled" due to "severe degenerative joint disease" in both hips, as well as lower back

problems.  Plaintiff submitted supporting documentation from his orthopedic surgeon,

Dr. Yousif Hamati.  Dr. Hamati characterized Plaintiff's condition as a "total and permanent

disability."  (AR 11-13, 15-16, 19.)  However, in his September 4, 2002 attending-physician

statement, Dr. Hamati stated that Plaintiff had a "moderate limitation of functional capacity"

and was "capable of clerical/administrative (sedentary) activity."  (AR 12.)  Plaintiff's family

physician indicated that Plaintiff's prognosis over the next 6 to 24 months was "unknown"

and he did not know whether Plaintiff could perform sedentary work.  (AR 14.)

The Company's occupational physician, Dr. Bradley Friedland, reviewed Plaintiff's

medical records and examined Plaintiff on October 15, 2002.  He concluded that Plaintiff

could perform light duty jobs involving sitting, standing, short walking, carrying objects up

to 20 pounds, and manipulating larger objects with mechanical means.  He therefore

concluded that Plaintiff was not totally and permanently disabled under the Plan.  (AR 5.)

On October 31, 2002, Dr. Anthony Meier, an internist, reviewed Dr. Friedland's report and

concurred with his conclusion.  (AR 7-8.)  On May 19, 2003, a vocational assessment was

performed on Plaintiff, finding that he had extensive experience in testing and maintaining the Company's fire prevention and detection system and should be easily employable given his craft knowledge and fire protection experience.  The assessment noted, however, that employment prospects in West Michigan were bleak.  (AR 23-24.)  Plaintiff also submitted documentation showing that he was receiving social security disability benefits and had received $30,000 in benefits under Aetna Permanent and Total Disability Group Life Insurance.  (AR 28-32.)

Based on the above-cited information, the Plan Administrator denied Plaintiff's permanent and total disability benefits claim on August 26, 2003.  The Administrator determined that Plaintiff had not presented "satisfactory proof" that a total and permanent disability existed under the Plan terms.  The benefits denial letter listed the following "key factors" in the Plan Administrator's decision:

- September 11, 2002 note from Dr. Kiley stating prognosis is unknown;
- September 19, 2002 note from Dr. Hamati, stating total and permanent disability (only 7 months post-operative);
- Assessment from Dr. Friedland, Mill Physician, dated Oct 15, 2002, that your condition does not meet the criteria of total and permanent disability retirement;
- Assessment from Dr. Meier, dated Oct 31, 2002, noting that you were recovering from hip surgery and not totally and permanently disabled;
- January 2003 information indicating that a second hip surgery was scheduled; therefore, the status of Maximum Medical Improvement is unclear;
- Vocational Assessment, dated May 30, 2003, notes that you should be easily employable, given your expertise and knowledge in fire protection;
- Light duty work availability at the Muskegon mill in early 2003.

(AR 34.)

Plaintiff appealed to the Administrative Committee on September 15, 2003, requesting a 180-day extension of time in which to submit additional information in support of his appeal. (AR 36-37.) On November 24, 2003, Plaintiff made a renewed request for extension for 120 days. (AR 38.) Plaintiff was granted an extension of time to submit additional documentation in support of his appeal until March 19, 2004. (AR 52-53.)

In support of his appeal, Plaintiff submitted three items. On December 19, 2003, he submitted the sworn statement of his orthopedic surgeon, Dr. Yousif Hamati. (AR 41-60.) Dr. Hamati testified as to the course of his treatment of Plaintiff. He performed a cementless total left hip replacement on Plaintiff on February 25, 2002. The surgery was necessitated by Plaintiff's slipped capital femoral epiphysis. Hamati unqualifiedly testified that Plaintiff could not go back to work and was totally and permanently disabled by severe arthritis in both hips and advanced degenerative osteoarthritis of the lumbar spine. Hamati testified that Plaintiff would need a total right hip replacement in the future, in addition to the left hip replacement he already had received. He also testified that Plaintiff had received four nerve root injections within the past year to treat bilateral radicular pain caused by the degenerative osteoarthritis of the spine. Dr. Hamati predicted that, at some point, Plaintiff most likely would need spinal fusion, though Hamati hoped to postpone such surgery by balancing Plaintiff's hips better. (AR 46-47.) He testified that Plaintiff had difficulty sitting and was limited to between 30 and 45 minutes of sitting at a time. According to Dr. Hamati, Plaintiff also had limited ability to stand, requiring crutches that would impair his ability to use his

upper extremities for any kind of activities while standing.  Dr. Hamati stated that Plaintiff was "literally disabled" by "stiffness, pain, inability to sit for long time, inability to stand for long time, continuation of changing position."  (AR 47-48.)  Dr. Hamati "doubted" whether Plaintiff could ever return to a job working "eight hours a day, five days a week." According to Dr. Hamati, Plaintiff took Celebrex every day, plus Darvocet for pain.  (AR 49.) Dr. Hamati testified that Plaintiff's condition was consistent with Plaintiff's claim that, when he had to take pain medications, he needed to lie down at least twice a day for an hour-and-a-half to two hours.  (AR 49.)

Upon review of Plaintiff's appeal and supporting documents in December 2004, the Administrative Committee tabled its decision on the grounds that it could not reconcile conflicting medical opinions on the gravity of Plaintiff's disability.  The Committee declared its intent to seek additional medical information from an independent medical examination. (AR 62.)

Dr. Grant Hyatt, an orthopedic surgeon, conducted an independent medical examination on March 17, 2005.  Dr. Hyatt relied upon his own prior examination and medical history taken August 14, 2002, a second examination of Plaintiff conducted March 17, 2005,

> supplemented by a review of additional medical records provided from the following sources:
>
> 1.   Bradley Friedland, D.O.
> 2.   Anthony Meier, M.D., Lansing, Michigan.
> 3.   Yousif Hamati, M.D., Muskegon, Michigan.
> 4.   Peter Herkner, M.D., Grand Rapids, Michigan.

(AR 75-76.)  According to the record, Hyatt was sent Dr. Herkner's report by Defendant's disability management specialist, Kristi Lambert, R.N., who advised Hyatt that Dr. Herkner's opinion was generated in Plaintiff's workers' compensation appeal in state court.[1]  After review, Dr. Hyatt confirmed that Plaintiff's complaints of low back pain and stiffness were consistent with diagnostic testing of degenerative disc disease at levels L4-5 and L5-S1, associated with facet arthropathy.  He noted that Plaintiff had had a satisfactory recovery from his left hip replacement and was at maximum medical improvement with regard to that

---

[1]Dr. Herkner's report itself relied on numerous medical documents, including various depositions by medical experts conducted in connection with Plaintiff's workers' compensation claim that were not part of the administrative record before the Administrative Committee.  Specifically, Dr. Herkner's report recites receiving a June 20, 2002 independent medical assessment by Dr. Henry Ottens finding "a history of bilateral slipped capital femoral epiphysis, recent left total hip arthroplasty, degenerative joint disease right hip, and degenerative lumbar disease.  Dr. Ottens did feel that Mr. Grissom's work at Sappi Paper Company was extremely physical and did contribute to Mr. Grissom's degenerative disease."  In addition, Dr. Herkner's report recites an August 14, 2002 independent medical assessment by Dr. Hyatt, in which Hyatt concluded that both vocational and avocational activities caused pathologic aggravation of Plaintiff's left hip disease.  Dr. Herkner also relied on Dr. Otten's August 5, 2002 deposition from which he "believe[d] it was Dr. Otten's opinion that Mr. Grissom was partially permanently disabled and could do only sedentary work."  Dr. Herkner recorded reviewing two depositions by Dr. Hamati dated August 27, 2002 and April 15, 2003, and two prior depositions by Dr. Hyatt dated September 24, 2002 and February 14, 2003, all of which focused on whether Plaintiff's condition was causally connected to any degree.  Finally, Dr. Herkner recorded having reviewed two depositions by Dr. Friedland on April 30, 2003 and November 14, 2003, the first of which indicated Dr. Friedland's belief that Plaintiff could perform lighter work that did not involve lifting more than 20 pounds.  Dr. Herkner did not list Dr. Hamati's sworn statement among the documents he reviewed.  Dr. Herkner concluded that Plaintiff was not totally and permanently disabled as defined by the plan because he believed Plaintiff could work with certain functional restrictions: a lift/carry limit of 20 to 25 pounds, avoidance of squatting, climbing and working on unlevel surfaces, and having a sit/stand option.  (AR 81.)

part of his condition.  Further, he found Plaintiff's complaints of progressively increasing

right hip symptoms were clinically consistent with underlying mild to moderate degenerative

joint disease secondary to the effects of his 1969 multiple joint pinning to correct slipped

capital femoral epiphysis.  He concluded, however, that Plaintiff was not totally and

permanently disabled, though he should continue to have functional restrictions, including

a lift/carry limit of 20 to 25 pounds, avoidance of squatting, climbing and working on unlevel

surfaces, and the provision of a sit/stand option.  (AR 80-81.)

On April 28, 2005, the Administrative Committee met again to consider Plaintiff's

appeal.  According to the minutes of the meeting,

> Discussion and comment followed in the case of Stanley Grissom whose
> pension disability claim, under the S.D. Warren Company Central Mills
> Employees' Retirement Plan, (the "Plan"), was denied.  In the December
> meeting, the committee reviewed applicable documents from the case and
> could not reconcile conflicting medical opinions on the gravity of
> Mr. Grissom's disability relative to a total and permanent disability, as defined
> in the Plan.  The Committee decided to table its decision and requested
> additional medical information from an independent medical examination. An
> independent medical examination was performed on March 17, 2005 and the
> results of this exam were presented to the committee for review.  The
> committee was influenced by the fact that the results of this examination did
> not support a total and permanent disability as defined by the plan.
>
> **Committtee Action: The Committee decided to uphold the decision
> of the Plan Administrator, thus denying the appeal.  D. Corliss will
> communicate this decision to Mr. Grissom.**

(AR 103.)

Plaintiff was informed of the decision in a letter dated May 17, 2005.  In that letter,

the Administrative Committee stated its rationale as follows:

- 8 -

Upon review and discussion, the Committee upheld the decision to deny your application for disability retirement. The Committee concluded you failed to satisfy, to the Committee's satisfaction, the requirements under section 5.3 of the Plan that you present adequate proof you have incurred a Total and Permanent Disability, in which such disability is defined under Section 2.46 of the Plan. The Committee was persuaded by the following information:

> **The results of the Independent Medical Examination did not provide conclusive evidence to support a total and permanent disability as defined by the Plan.**

(AR 106.) The decision letter also listed the documents considered by the Committee, but that list did not mention the sworn statement of Dr. Hamati that Plaintiff had provided on December 19, 2003.

On November 10, 2005, Plaintiff appealed the decision of the Administrative Committee to this Court, pursuant to 29 U.S.C. § 1132(a)(1)(B).

## II.

A district court generally reviews *de novo* a plan administrator's denial of benefits, unless the ERISA plan expressly provides discretion to the administrator to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Marks v. Newcourt Credit Group*, 342 F.3d 444, 456 (6th Cir. 2003); *Wilkins*, 150 F.3d at 613; *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991). Where the plan grants discretion to the administrator, the court employs an "arbitrary and capricious" standard of review. *Id.*

The parties agree that the Plan terms unequivocally confer discretion on the Plan Administrator to both construe the terms of the Plan and determine eligibility of benefits. As a consequence, the Court will apply the arbitrary and capricious standard of review.

Under the arbitrary and capricious standard, a court will uphold an administrator's decision "if it is 'rational in light of the plan's provisions.'" *Marks*, 342 F.3d at 457 (quoting *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998); *see also Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). However, "'[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision.'" *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (quoting *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). The task of the Court is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Moreover, where an employer both funds and administers the plan, the court must take into account that the employer is acting under a conflict of interest. *Marks*, 342 F.3d at 457 (citing *Bruch*, 489 U.S. at 115 (noting that courts should be attentive to conflicts of interest in this context), and *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 847 n.4 (6th Cir. 2000) (recognizing potential for self-interested decision-making where plan sponsor both bears the risk of paying claims and appoints the body designated as the final arbiter of such claims)).

### III.

Plaintiff argues that the Plan Administrator arbitrarily and capriciously denied him benefits under the Plan. First, he suggests that the Employer-appointed Administrative Committee was biased and was influenced in its decisionmaking by Plaintiff's status as a

worker's compensation claimant.  Plaintiff suggests that the Plan Administrator and Administrative Committee routinely and discriminatorily denied disability retirement to workers' compensation claimants in order to coerce those employees to agree to lump-sum settlements of their workers' compensation claims.  Plaintiff's argument, in essence, is that the Plan Administrator and Administrative Committee were influenced in their decisionmaking by the Company's conflict of interest as both the funder and administrator of the Plan.[2]

Second, Plaintiff argues that the Administrative Committee acted arbitrarily and capriciously when it reached its decision to deny benefits without considering the sworn statement of Plaintiff's treating orthopedic surgeon, Dr. Hamati.  In support of this argument, Plaintiff points to a number of failures to mention the statement in the record.  For example, in their decision of December 13, 2004 to table the decision and seek an independent medical examination, the Committee failed to mention having received either Dr. Hamati's report or the affidavits of Plaintiff and his wife.  Similarly, after receiving the report of the independent medical examiner, Dr. Hyatt, the Committee minutes reflect that the Committee

---

[2]The Court notes that the Plan is funded by the S.D. Warren Company and applies to the related companies in the affiliated group, apparently including Sappi Fine Paper. The Plan Administrator is appointed by the board of directors of the S.D. Warren Company. Plaintiff fails to clarify the relationship between S.D. Warren and Sappi Fine Paper. However, because it makes no difference to the result, the Court will assume for purposes of this decision that the companies are sufficiently interrelated so as to create a conflict of interest for the Administrative Committee.  *See Marks*, 305 F.3d at 457 (noting that reviewing courts must take into account conflicts of interest of a plan administrator).

was influenced only "by the fact that the results of this examination did not support a total and permanent disability." (AR 103.) Further, the May 13, 2005 letter notifying Plaintiff of the decision of the Administrative Committee to deny benefits expressly stated only that the Committee was "persuaded by" by the fact that "[t]he results of the Independent Medical Examination did not provide conclusive evidence to support a total and permanent disability as defined by the Plan." (AR 106.) The same letter listed all of the information upon which the Committee had relied. That list did not include the sworn statement of Dr. Hamati.

Upon review of the whole record, and giving due consideration to the Plan Administrator's conflict of interest, the Court concludes that the Administrator's decision is neither arbitrary nor capricious. First, it is apparent from the whole record that the Administrator considered the December 15, 2003 sworn statement of Dr. Hamati during its decisionmaking and that the failure to mention the sworn statement in the notice of decision was simply a typographical error. The Court notes that Plan Adminstrator Michael Hennessey responded to a question from Plaintiff's attorney dated August 3, 2005, advising counsel that the sworn statement was part of the administrative record considered by the Committee. As evidence of that fact, Hennessey enclosed a copy of his January 19, 2004 letter to counsel that confirmed receipt of the statement and committed to include the statement in the record. (AR 111-13.) The Court notes that Hennessey's January 19, 2005 letter was itself listed as part of the administrative record in the May 13, 2005 letter informing Plaintiff that his disability claim had been denied. (AR 105.) In addition, the

- 12 -

administrative record provided to Plaintiff contained a summary of the documents presented to the Administrative Committee at its April 28, 2005 meeting. That summary listed Dr. Hamati's sworn statement and set forth a synopsis of the statement's contents. (AR 100-02.) A similar summary of the documents to be reviewed by the Committee was prepared for the December 14, 2004 meeting. That summary also listed and summarized Dr. Hamati's December 15, 2003 sworn statement and listed Hennessey's January 19, 2004 letter acknowledging receipt of the statement. (AR 63-64.) The record, therefore, is replete with evidence that the Administrative Committee considered Dr. Hamati's sworn statement at both the December 14, 2004 meeting and the April 28, 2005 meeting.

In addition, the course of decisionmaking contains no significant suggestion that the Committee was influenced by its conflict of interest in reaching its decision. At the December 14, 2004 meeting, the Committee had Plaintiff's medical records, including the sworn statement of Dr. Hamati, which provided substantial evidence that Plaintiff was totally and permanently disabled. However, Dr. Hamati's sworn statement was not unopposed and was not entirely consistent with Hamati's own earlier suggestion that Plaintiff was capable of returning to light work. Dr. Friedland examined Plaintiff and reviewed his medical records and concluded that Plaintiff was capable of the light work that had been offered him. Friedland's conclusion was further supported by Dr. Meier's independent review of the record. As a result, at the time of the December 14, 2004 meeting, the Committee was unquestionably faced with conflicting evidence.

- 13 -

Ordinarily, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining ERISA eligibility for benefits, the administrator's decision cannot be said to be arbitrary and capricious because it would be possible to offer a reasoned explanation for the administrator's decision.  *See McDonald*, 347 F.3d at 169. Moreover, the Supreme Court squarely has held "that plan administrators are not obliged to accord special deference to the opinions of treating physicians . . . ."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Nevertheless, faced with a conflict between Dr. Hamati and Dr. Freidland and Dr. Meier, the Administrative Committee did not simply elect to credit the opinions of Drs. Friedland and Meier.  Perhaps because neither doctor specialized in orthopedic surgery, the Administrative Committee tabled its decision and sought an independent medical examination by an orthopedic surgeon.  The decision to seek another opinion, therefore, does not itself suggest that the Committee was intending to shop for an opinion that opposed a medical record that uniformly supported an opinion the Committee did not like.  Instead, the Committee's decision to seek an independent medical examination is rationally supported as an attempt to obtain clarifying information.  *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).

The Administrative Committee thereafter engaged the services of Dr. Grant Hyatt, who concluded that Plaintiff was not totally and permanently disabled.  On April 28, 2005, after receiving Hyatt's report, the Administrative Committee denied Plaintiff's claim.

- 14 -

The Sixth Circuit has, in a variety of circumstances, rejected an administrator's reliance on the conclusion of an independent medical examiner or vocational expert if the expert's opinion was based on a selective medical record, failed to include examination of the claimant or failed to address key components of the medical record. *See, e.g.*, *Evans v. UNUM Provident Corp.*, 434 F.3d 866 (6th Cir. 2006) (finding administrator acted arbitrarily and capriciously by relying solely on file review by in-house physician); *Moon*, 405 F.3d at 381 (finding arbitrary an administrator's reliance on opinion by in-house physician based solely on selective review of the record); *McDonald*, 347 F.3d at 170-71 (finding that, in light of overwhelming evidence from the treating psychiatrist and treating psychologist and two independent psychiatric examiners that plaintiff was disabled, together with the third independent psychiatrist's own initial ambiguous report, the administrator acted arbitrarily by relying on the third psychiatrist's significantly different supplemental report, which itself was prompted by ex-parte contact from administrator); *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (applying arbitrary and capricious review and rejecting administrator's reliance upon the opinion of a vocational consultant where the employer had "cherry-picked" the medical information it had provided to the consultant).

Here, in contrast, the independent medical examination was conducted by a board-certified orthopedic surgeon who physically examined Plaintiff and already had examined him on a prior occasion. Dr. Hyatt's report states that he reviewed the medical records of four doctors: Dr. Friedland, Dr. Meier, Dr. Hamati and Dr. Herkner. While the Court

previously noted that Dr. Herkner did not receive Dr. Hamati's sworn statement before rendering his opinion, no evidence exists that Dr. Hyatt did not receive and review it. Indeed, Dr. Hyatt describes receiving "medical records" from four doctors. Those records unquestionably included opinion reports, since Dr. Meier and Dr. Herkner provided no records other than such reports.  Further, the text of Hyatt's report reveals that he relied on records provided by Dr. Hamati at least as late as September 14, 2004, well after Hamati made his sworn statement.  Both facts suggest that Hyatt was also provided with Hamati's opinion reports, including Hamati's sworn statement.  As a result, in contrast with *Spangler*, 313 F.3d at 362, and *Moon*, 405 F.3d at 381, the record does not support a conclusion that Dr. Hyatt's opinion was based on a restricted set of medical evidence.

Having physically examined Plaintiff and reviewed the medical records, Dr. Hyatt made objective findings similar to those of Dr. Hamati.  However, he disagreed with Dr. Hamati's conclusion that Plaintiff was totally and permanently disabled, concluding Plaintiff retained the ability do light duty and sedentary work with appropriate restrictions and a sit/stand option.  Hyatt's decision was consistent with the opinions of Dr. Friedland, Dr. Meier and Dr. Herkner.  As a result, the Committee's decision to credit Hyatt's conclusion was neither arbitrary nor capricious.  *See McDonald*, 347 F.3d at 169.

In sum, having weighed the evidence on the whole record and having considered the Administrative Committee's inherent conflict of interest, the Court finds the decision of the Administrative Committee to be rationally supported on the whole record.  While the Court

- 16 -

might have reached a different determination had it considered the evidence in the first instance, the Administrative Committee's decision was neither arbitrary nor capricious.

## IV.

For the foregoing reasons, the Court will grant Defendant's motion for judgment on the administrative record and will deny Plaintiff's cross-motion for judgment on the administrative record.  A judgment consistent with this opinion shall be entered.


Date: ____August 2, 2006_____        /s/ Robert Holmes Bell_____
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE